UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

LAURIE J. FINE,

                                        Plaintiff,

                -against-                                    5:12-CV-0836 (LEK/DEP)

ESPN, INC., *et al.*,

                                        Defendants.

_____

## MEMORANDUM-DECISION and ORDER

## I.    INTRODUCTION

        Presently before the Court in this defamation action is non-party Syracuse University's

("Syracuse" or "the University") Motion to set aside two Decision and Orders filed by the

Honorable David E. Peebles, U.S. Magistrate Judge, granting in part Plaintiff Laurie Fine's

("Plaintiff") Motion to compel the University's compliance with a subpoena.  Dkt. Nos. 84

("Motion"); 84-1 ("Memorandum"); 72 ("Work-Product Order"); 83 ("December Attorney-Client

Privilege Order").  For the following reasons, the University's Motion is denied and the Work-

Product Order and December Attorney-Client Privilege Order are affirmed.

## II.    BACKGROUND

        The Court presumes the parties' familiarity with the facts and history of this case, and recites

only those facts necessary to the resolution of the pending Motion.  For a complete statement of

Plaintiff's claims and the history of this case, reference is made to the Complaint and the 2013

Order.  Dkt. Nos. 1 ("Complaint"); 21 ("2013 Order").

        Plaintiff commenced this action in May 2012, against Defendants ESPN and two ESPN

employees, alleging defamation.  See 2013 Order at 1-4; Compl.  "Plaintiff's claims arise [out of]

ESPN's coverage of sexual abuse allegations against [P]laintiff's husband, a former employee of

[the] University." Dec. Att'y-Client Privilege Order at 2.  In 2005, the University conducted an

investigation into those allegations (the "2005 investigation").  Id.  Documents related to the

University's 2005 investigation are the subject of the present dispute.

### A.  Motion to Compel

In December 2012, Plaintiff served the University with a subpoena *duces tecum,* directing

the University to produce documents related to the 2005 investigation.  See generally Dkt. No. 63-2.

The University produced the requested documents, but withheld a number of documents, asserting

that they were protected by the attorney-client privilege and the work-product doctrine.  See Dec.

Att'y-Client Privilege Order at 2, 4.  The University also produced a privilege log identifying the

withheld documents and the grounds asserted for privilege.  Id. at 2; Dkt. No. 63-3 ("Privilege

Log").

On August 30, 2014, Plaintiff filed a Motion to compel the University to comply with the

subpoena, arguing that the University's Privilege Log was insufficient to meet its burden of showing

that the withheld documents were privileged, and asking the court to review the documents *in

camera* in order to determine if the University's asserted privileges applied.  See generally Dkt. Nos.

63; 63-1 ("Motion to Compel").  The University opposed the Motion to compel, arguing, *inter alia*,

that *in camera* review of the withheld documents was inappropriate absent specific challenges by

Plaintiff to the University's assertions of privilege.  Dkt. No. 66.  On September 30, 2014, Judge

Peebles heard oral arguments on Plaintiff's Motion to compel, and ordered the University to submit

the withheld documents for *in camera* review.  Dec. Att'y-Client Privilege Order at 3-4.

## B. Work-Product Order

On October 3, 2014, the University filed an Affidavit from Peter A. Jones ("Jones"), an attorney retained by the University to assist with the 2005 investigation. See Dkt. No. 68 ("Jones Affidavit"). Jones stated that the University asked him to work with its human resources department to conduct the 2005 investigation, and that his law firm, Bond Schoeneck & King PLLC ("BSK") "frequently assisted the University with these types of human resources and employment matters and provided varying levels of support based on the nature of the allegations." Id. ¶¶ 1, 4. During the investigation, Jones interviewed witnesses, "took notes[] and drafted witness statements," and prepared a final report, with assistance from the University's human resources department. Id. ¶¶ 6-7. Jones further stated that during the investigation, he "anticipated that [Robert Davis ("Davis"), who had brought the allegations] might bring legal action against the University based on his allegations," and that Davis "[planned] to demand compensation." Id. ¶ 9. Jones also believed that the University anticipated legal action at the time of the investigation. See id. ¶ 10. Plaintiff's attorney filed an Affidavit in opposition to the Jones Affidavit, arguing, *inter alia*, that the contentions in the Jones Affidavit were unsupported, and that the affidavit "fail[ed] to satisfy the University's burden to establish that the documents being reviewed *in camera . . .* are protected from disclosure by the work product doctrine." Dkt. No. 69 ¶ 6.

On October 16, 2014, Judge Peebles issued a Decision and Order granting Plaintiff's Motion to compel as to documents withheld solely on the basis of the work-product doctrine. See generally Work-Product Order. Finding that the University had conducted the 2005 investigation for business purposes, rather than "because it reasonably anticipated that it would be sued," id. at 9, Judge Peebles found that documents created during the 2005 investigation were not entitled to work-

product protection, id. at 15. Specifically, Judge Peebles found relevant that the Jones Affidavit stated that the University frequently hired BSK to assist with human resources matters, suggesting that "the investigation concerning Davis' allegations was fairly routine and would have been undertaken even in the complete absence of an anticipation of litigation." Id. at 10. He also noted that a letter from Davis to the University—in which Davis stated that he wanted the matter investigated because "the accused abuser 'needs serious help,'" id. (citing Dkt. No. 69-1 at 1)—suggested that the University did not necessarily expect litigation in conjunction with Davis's allegations, see id. Judge Peebles deferred a decision on documents withheld on the basis of attorney-client privilege pending *in camera* review of those documents. Id. at 2-3.

### C. Attorney-Client Privilege Orders

Following the Work-Product Order, the University filed a Letter Brief describing its relationship with certain individuals listed in the Privilege Log. Dkt. No. 74 ("Letter Brief"). The Letter Brief explained that: (1) the University's counsel had retained the public relations firm Sard Verbinnen in connection with its representation of the University; (2) Paul Verbinnen "and his colleagues worked at the direction of [the University's lawyers] and assisted [them] in [the] provision of legal advice to Syracuse"; and (3) "[a]ccordingly, [the University] . . . asserted the attorney-client privilege over protected communications that include Sard Verbinnen." Id. at 1-2.

On November 7, 2014, after reviewing the withheld documents *in camera*, Judge Peebles ordered the University to produce certain documents that had previously been withheld on the basis of attorney-client privilege, including all communications that included Sard Verbinnen. Dkt. No. 76 ("November Attorney-Client Privilege Order"). Judge Peebles found that Sard Verbinnen had provided ordinary public relations advice to the University, and that "the communications between

the University, its law firm, and/or Sard Verbinnen do not reveal that Sard Verbinnen was included in the communications for the purpose of obtaining legal advice." Id. at 4-5. Noting that the University had the burden to establish that the attorney-client privilege applied to these communications, and that "the University ha[d] provided the court with scant background regarding its relationship with Sard Verbinnen and no context for the individual communications," id. at 5, Judge Peebles ordered the University to produce all communications withheld on the basis of attorney-client privilege that included Sard Verbinnen, id. at 6.

On November 21, 2014, the University filed a Motion to reconsider the November Attorney-Client Privilege Order with respect to twenty-two documents. See Dkt. Nos. 79-1 ("Motion to Reconsider") at 1; 81.[1] The University argued that because Plaintiff had not raised specific objections to the University's assertions of privilege, the University "had no opportunity to brief these issues." Mot. Recons. at 1. The University also provided further detail on its relationship with Sard Verbinnen, stating, *inter alia*, that Sard Verbinnen initially worked with outside counsel "to ensure a cohesive approach to the University's response and related communications" surrounding the 2005 allegations about Plaintiff's husband, and that the University's lawyers at the law firm Debevoise & Plimpton ("Debevoise") later "retained Sard Verbinnen to continue its important role in assisting counsel in providing legal advice around communications and publicity." Id. at 7. The University additionally argued that documents shared among the University, its Board of Trustees (the "Board"), and their respective counsels remained protected from disclosure under

---

[1] The University initially requested reconsideration of eighteen documents. Mot. Recons. at 1. However, when submitting the documents for *in camera* review, the University requested that Judge Peebles review an additional four documents. See generally Dkt. No. 81. Judge Peebles reviewed these additional documents. See Dec. Att'y-Client Privilege Order at 4.

the common-interest privilege.  Id. at 10-11.  Plaintiff opposed the Motion.  Dkt. No. 82.

The University filed with the Motion to reconsider Affidavits from Mary Beth Hogan ("Hogan") of Debevoise and Daniel French ("French"), who served as outside counsel to the University.  Dkt. Nos. 79-2 ("Hogan Affidavit"); 79-14 ("French Affidavit").  The Affidavits stated, *inter alia*, that: (1) early in the 2005 investigation, French consulted with Sard Verbinnen in order to "neutraliz[e] negative media coverage" and avoid future litigation, French Aff. ¶ 7; (2) the District Attorney's and U.S. Attorney's Offices had issued subpoenas to the University regarding the allegations against Plaintiff's husband, Hogan Aff. ¶ 4; (3) the 2005 investigation attracted "substantial press coverage," id. ¶ 7; (4) attorneys for the University believed that the response to media reports could affect the University's legal liability, see id. ¶ 8; and (5) Debevoise consulted with Sard Verbinnen on matters including "press releases and other communications that incorporated and reflected legal advice," which required sharing privileged information, id. ¶ 10.  The University also filed Exhibits demonstrating media coverage of the 2005 investigation and the possibility that the University faced legal action at the time.  Dkt. Nos. 79-3 through 79-13 ("Exhibits").

On December 24, 2014, Judge Peebles granted the Motion to reconsider in limited part, with respect to two documents, and denied it in all other respects.  Dec. Att'y-Client Privilege Order.  In the December Attorney-Client Privilege Order, Judge Peebles found that the Privilege Log was insufficient to establish that the attorney-client privilege applied to the withheld documents because the University "failed to identify the roles or titles of any of the individuals listed in the log."  See id. at 9.  Furthermore, Judge Peebles rejected the University's contention that there was a burden on Plaintiff to specifically object to the application of privilege to documents listed in the log, noting,

"[w]ithout the missing information, it is difficult to understand how the University could expect (or, for that matter, place a burden on) plaintiff to specifically articulate any waiver issues with respect to Sard Verbinnen or the members of the Board of Trustees." Id. He also found that the University had ample opportunity to brief these issues, including: (1) in its Response to Plaintiff's Motion to compel; (2) when it presented oral argument on the Motion to compel; and (3) when it provided additional briefing to the court following oral arguments. Id. at 10-11. Judge Peebles also highlighted that as of the Motion to reconsider, the University still had not identified which individuals listed in the Privilege Log were members of the University's Board. Id. at 10 & n.2.

Despite his belief that "the University [sought] to use [the Motion to reconsider] to raise arguments and set forth evidence that could have been presented earlier but for its neglect," id. at 11, Judge Peebles reviewed the withheld documents *in camera*, in light of the new information provided by the University, and found that redaction of the documents purportedly subject to the common-interest privilege was not warranted, see id. at 12-13. Judge Peebles further found with respect to the communications including Sard Verbinnen that, with two limited exceptions, the documents did not contain privileged information and ordered the University to produce them in full. Id. at 13. The instant Motion ensued. Mot. Plaintiff opposes the Motion. Dkt. No. 85 ("Response").

## III.    LEGAL STANDARD

In reviewing a magistrate judge's orders concerning nondispositive matters, "'[t]he district judge in the case must consider timely objections and modify or set aside any part of the [magistrate judge's] order that is clearly erroneous or contrary to law.'" Arista Records, LLC v. Doe 3, 604

F.3d 110, 116 (2d Cir. 2010) (quoting Fed. R. Civ. P. 72(a)); see also 28 U.S.C. § 636(b)(1)(A).[2]

An order is "clearly erroneous when although there is evidence to support it, the reviewing court on

the entire evidence is left with the definite and firm conviction that a mistake has been committed."

United States v. U.S. Gypsum Co., 333 U.S. 364, 395 (1948) (internal quotation marks omitted); see

also Easley v. Cromartie, 532 U.S. 234, 242 (2001) (quoting U.S. Gypsum Co., 333 U.S. at 395).

An order is contrary to the law "if it fails to apply or misapplies relevant statutes, case law or rules

of procedure." Tompkins v. R.J. Reynolds Tobacco Co., 92 F. Supp. 2d 70, 74 (N.D.N.Y. 2000)

(internal quotation marks omitted); see also New York v. Salazar, No. 08-CV-644, 2011 WL

1938232, at *4 (N.D.N.Y. Mar. 8, 2011) (Kahn, J.). "[A] magistrate judge is afforded broad

discretion when resolving discovery disputes and a reversal is appropriate only if the district judge

finds that discretion is abused." Moore v. Publicis Groupe SA, No. 11 Civ. 1279, 2012 WL 517207,

at *1 (S.D.N.Y. Feb. 14, 2012); see also Leviton Mfg. Co. v. Greenberg Traurig LLP, No. 09 CIV.

08083, 2011 WL 2946380, at *1 (S.D.N.Y. July 14, 2011) ("It is well-settled that a magistrate

judge's resolution of a non-dispositive matter should be afforded substantial deference and may be

overturned only if found to have been an abuse of discretion") (citation omitted). "Thus 'a party

seeking to overturn a discovery order bears a heavy burden.'" Moore, 2012 WL 517207, at *1

(quoting AP Links, LLC v. Global Golf, Inc., No. 08-CV-1730, 2011 WL 888261, at *4 (E.D.N.Y.

Mar 14, 2011)).

## IV.    DISCUSSION

In the instant Motion, the University argues that the Work-Product Order and the December

---

[2] "Pretrial discovery matters, 'including those regarding privilege issues, are nondispositive matters.'" Anwar v. Fairfield Greenwich Ltd., 982 F. Supp. 2d 260, 262 (S.D.N.Y. 2013) (citations omitted).

Attorney-Client Privilege Order are "contrary to established law and should be set aside." Mem. at 1. The Court considers the University's objections to these Orders in turn.

### A. Work-Product Order

The University objects to the Work-Product Order on the grounds that: (1) Judge Peebles erred in finding that documents produced during the 2005 investigation were not privileged because the investigation had a business purpose; (2) the facts establish that the 2005 investigation was conducted in anticipation of litigation; and (3) two cases on which Judge Peebles relied do not support his ruling. See generally Mem.

#### 1. Legal Standard

Pursuant to the work-product doctrine, "[o]rdinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative." FED. R. CIV. P. 26(b)(3)(A).[3] The doctrine "is intended to preserve a zone of privacy in which a lawyer can prepare and develop legal theories and strategy 'with an eye toward litigation,' free from unnecessary intrusion by his adversaries." United States v. Adlman, 134 F.3d 1194, 1196 (2d Cir. 1998) (quoting Hickman v. Taylor, 329 U.S. 495, 510-11 (1947)). To be protected from disclosure under the work-product doctrine, a document must have been prepared "in anticipation of litigation." In re Grand Jury Proceeding, 79 F. App'x 476, 477 (2d Cir. 2003) (citations omitted). "A document is prepared in anticipation of litigation when, 'in light of the nature of the document and the factual situation in the particular case, [it] can fairly be said to have

---

[3] Even in a diversity action, "federal law governs the application of the work product doctrine." Egiazaryan v. Zalmayev, 290 F.R.D. 421, 435 (S.D.N.Y. 2013) (citing Allied Irish Banks, P.L.C. v. Bank of Am., N.A., 252 F.R.D. 163, 173 (S.D.N.Y. 2008) and Danza v. Costco Wholesale Corp., No. CV-11-4306, 2012 WL 832289, at *1 (E.D.N.Y. Mar. 12, 2012)).

been prepared or obtained *because of* the prospect of litigation.'" Id. (quoting Adlman, 134 F.3d at 1202) (emphasis and alteration in original). "Work-product protection is not available for documents 'that are prepared in the ordinary course of business or that would have been created in essentially similar form irrespective of the litigation.'" Id. at 477-78 (quoting Adlman, 134 F.3d at 1202). A document created for both a business purpose and litigation may be protected under the work-product doctrine even if litigation is not the primary purpose, "as long as the document would not have been prepared in substantially similar form if not for the prospect of litigation." In re Veeco Instruments, Inc. Sec. Litig., No. 05-MD-01695, 2007 WL 724555, at *5 (S.D.N.Y. Mar. 9, 2007) (citing Adlman, 134 F.3d at 1195).

### 2. Documents Prepared "in Anticipation of Litigation"

The University argues that Judge Peebles erred in finding that documents produced during the 2005 investigation were not protected by the work-product doctrine merely because they had some business purpose. Mem. at 8. Under Second Circuit precedent, the University argues, documents produced for a dual purpose are still protected as long as they were created in anticipation of litigation. Id. at 9. Therefore, the University argues, Judge Peebles erred in disregarding the University's claim that it anticipated litigation and "in placing controlling weight on any business purposes he ascribed to the 2005 investigation." Id. at 10. Plaintiff responds that the documents produced during the University's 2005 investigation are not entitled to work-product protection because they "'would have been created in essentially similar form irrespective of the litigation.'" See Resp. at 12-13 (quoting Adlman, 134 F.3d at 1202).

The University's arguments are misguided. While the University is correct in stating that "[a] document created with an eye toward litigation 'does not lose protection . . . merely because it

is created in order to assist with a business decision,'" Mem. at 9 (quoting <u>Adlman</u>, 134 F.3d at 1202), the fact that litigation was anticipated when a document was created is not dispositive of whether the document is entitled to work-product protection, <u>see</u> <u>Allied Irish Banks</u>, 240 F.R.D. at 106 (citing <u>Adlman</u>, 134 F.3d at 1203). When documents are created with a dual purpose—that is, a litigation and business purpose—"the next question to be answered is whether these documents 'would have been created in substantially similar form' based on this non-litigation purpose." <u>Id.</u> (quoting <u>Adlman</u>, 134 F.3d at 1203). If the documents would have been created in "essentially similar form irrespective of" anticipated litigation, the documents are not entitled to work-product protection. <u>See</u> <u>Adlman</u>, 134 F.3d at 1202 ("[I]t should be emphasized that the 'because of' formulation that we adopt here withholds protection from documents that are prepared in the ordinary course of business *or that would have been created in essentially similar form irrespective of the litigation*.") (emphasis added). Even where a party clearly anticipated litigation at the time a document was created, the party asserting privilege still bears the burden of showing that the document would *not* have been produced in a similar form absent anticipated litigation. <u>See</u> <u>Wultz v. Bank of China Ltd.</u>, 304 F.R.D. 384, 395 (S.D.N.Y. 2015) (finding that even where a company undertook an investigation in response to a demand letter, "this does not address the issue of whether it has shown the materials were prepared 'because' of its anticipation of litigation—that is, that the materials would not have been created 'in essentially similar form irrespective of the litigation.'" (citations omitted)); <u>In re Veeco Instruments</u>, 2007 WL 724555, at *4 ("[E]ven where '[t]here is little doubt under the evidence that [a party] had the prospect of litigation in mind when it directed the preparation of the [document]' . . . work product protection is not available for documents 'that are prepared in the ordinary course of business or that would have been created in

essentially similar form irrespective of litigation.'") (internal citations omitted) (alterations in original)).  Furthermore, like all privileges, the work-product doctrine "should be narrowly construed and expansions cautiously extended."  See United States v. Weissman, 195 F.3d 96, 100 (2d Cir. 1999) (citing Univ. of Pa. v. EEOC, 493 U.S. 182, 189 (1990)).  Consequently, the mere fact that the University claimed that it anticipated litigation during the 2005 investigation did not require Judge Peebles to find that the work-product doctrine applied.

### 2. Judge Peebles's Application of Legal Standard

The University further argues that "the undisputed facts show that the University and its attorneys conducted the [2005] investigation in anticipation of litigation."  Mem. at 6.  Specifically, the University argues that the Jones Affidavit demonstrates that the investigation dealt with a "serious and sensitive" matter, and that both Jones and the University anticipated litigation when the investigation was conducted.  See id.  Consequently, the University argues that the Jones Affidavit establishes that the work-product doctrine applies to documents compiled during the 2005 investigation, id. at 6-7, and that Judge Peebles "erred in disregarding the Jones Affidavit in its entirety," id. at 7.

In light of the evidence presented by the University, it was not clearly erroneous for Judge Peebles to conclude that the 2005 investigation was conducted for a business purpose, and not because of anticipated litigation.  As discussed *supra*, in order to claim protection of the work-product doctrine, the University must show not only that it anticipated litigation during the course of the 2005 investigation, but also that the documents in question would not have been created in essentially similar form had the University not anticipated litigation.  See Adlman, 134 F.3d at 1202.  It is the University's burden to establish these facts.  von Bulow by Auersperg v. von Bulow,

811 F.2d 136, 144 (2d Cir. 1987) ("'It is axiomatic that the burden is on a party claiming the protection of a privilege to establish those facts that are the essential elements of the privileged relationship.'") (citation omitted).  However, while the Jones Affidavit states that the University anticipated litigation at the time of the 2005 investigation, see Jones Aff. ¶¶ 9-10, it offers no evidence, nor does the University claim now, that the documents produced during the investigation would not have been prepared in the same form absent the prospect of litigation, see generally id.; Mem.  The Jones Affidavit states that BSK frequently handled investigations into employee conduct for the University, id. ¶ 4, and that this particular investigation dealt with a sensitive matter, id. ¶ 5, but provides no indication that this investigation was conducted differently from other investigations into potential employee misconduct because of the prospect of litigation, see generally id. Therefore, Judge Peebles did not err in concluding that "documents generated during the course of that investigation would have been prepared in the ordinary course of business irrespective of whether there was the potential for litigation."  Work-Product Order at 11.

The University also argues that Judge Peebles erred in treating as determinative an email from Davis stating that his "sole purpose" in bringing his allegations to the University's attention was to help Plaintiff's husband.  Mem. at 7-8.  However, Judge Peebles did not treat this letter as determinative, but rather considered it in conjunction with the Affidavit to bolster his finding that the University had not shown that it conducted the investigation because of the prospect of litigation.  See Work-Product Order at 10.  Furthermore, even if the Court disagrees with Judge Peebles's interpretation of the letter, that alone would not be sufficient to find that he abused his discretion.  See Anwar, 982 F. Supp. 2d at 263 ("'[T]hat reasonable minds may differ on the wisdom of granting [a party's] motion is not sufficient to overturn a magistrate judge's decision.'")

(citation omitted).[4]

### 3. Application of Specific Cases

Finally, the University argues that two cases on which Judge Peebles relied do not support his ruling. Judge Peebles found that the instant case was distinguishable from Robinson v. Time Warner, Inc., 187 F.R.D. 144, 146 (S.D.N.Y. 1999), because "this is not the type of situation where . . . an employee has complained that he has been discriminated against by the employer on the basis of a protected classification. Under such circumstances, the employer could reasonably anticipate that litigation would follow if the matter could not be successfully resolved." Work-Product Order at 10. Instead, Judge Peebles found that the instant case was "more akin to a situation where, for business reasons, an employer undertakes an investigation regarding allegations that one of its employees has acted improperly, in which case the work product doctrine would not be triggered." Id. at 11 (citing Welland v. Trainer, No. 00-CV-738, 2001 WL 1154666, at *2 (S.D.N.Y. Oct. 1, 2001)).

The University argues that Judge Peebles's reliance on these cases was erroneous. First, the University argues that Robinson supports the University's position, because in Robinson, as in the instant case, the investigation had human resources implications, but was also conducted in

---

[4] In reference to both the Work-Product Order and the December Attorney-Client Privilege Order, the University argues that Judge Peebles erred in requiring the University to produce additional evidence, despite "Plaintiff not meeting her burden to prove an exception to the privilege." Mem. at 7; see also id. at 15. The University cites Struogo v. BEA Assocs., 199 F.R.D. 515, 521 (S.D.N.Y. 2001), for the proposition that once the party claiming privilege has met its initial burden, the burden shifts to the party seeking access to the privileged material to show that an exception to the privilege applies. Mem. at 7. However, this argument presumes that the University met its burden to establish that privilege applied. As Judge Peebles found, and as the Court affirms here, there was no burden on Plaintiff to show an exception to privilege because the University had not meet its initial burden to demonstrate that the withheld documents were entitled to privilege, and that privilege had not been waived. The Court therefore finds this argument unavailing.

anticipation of litigation, and the court found that the resulting documents were entitled to work-product protection. See Mem. at 10. However, as discussed at length *supra*, merely anticipating litigation is not sufficient to show that documents produced during an investigation are entitled to work-product protection. Therefore, distinguishing the instant case from Robinson—a non-binding case—was not clearly erroneous.

The University further argues that Judge Peebles's reliance on Welland was misplaced because in Welland, the court noted that decisions about whether to terminate an employee "occur[] in the ordinary course of business," id. at 10-11 (citation omitted), while "[a]llegations of child sexual abuse could never be considered ordinary or routine," id. at 11. Plaintiff responds that the University's focus is misguided—in determining whether something is "ordinary or routine" for the purposes of work-product protection, "Welland does not consider whether a particular allegation . . . is or is not 'ordinary[,]'" but rather focuses on whether the type of investigation and the way in which it was conducted was ordinary. See Resp. at 14.

The Court agrees with Plaintiff. The key inquiry in determining whether documents produced during an investigation that has a dual purpose are entitled to work-product protection is whether the documents would have been produced in essentially similar form absent anticipated litigation. See Adlman, 134 F.3d at 1202. In Welland, the court found that even where a company took the unusual step of involving attorneys in an internal investigation, "it [was] clear that the investigation of an employee accused of unethical practices would occur in the ordinary course of business to determine whether or not to terminate that employee. . . . Therefore, the investigation documents that were produced . . . are not protected by the work product privilege." 2001 WL 1154666, at *2. Contrary to the University's argument, it is not the subject of the investigation that

Judge Peebles found routine, but rather the investigation itself. As discussed *supra*, the Jones Affidavit offers no explanation of how the 2005 investigation differed from a routine investigation into employee misconduct. Judge Peebles's reliance on Welland therefore was not an abuse of discretion. Consequently, the Court finds that Magistrate Judge Peebles's conclusion that withheld documents created during the 2005 investigation are not entitled to work-product protection is not clearly erroneous or contrary to law.

### B. December Attorney-Client Privilege Order

#### 1. Legal Standard

Since the Court's jurisdiction in this case is based on diversity, see Compl., New York law governs the applicability of the attorney-client privilege, see Egiazaryan, 290 F.R.D. at 428 (citing FED. R. EVID. 501 and In re Am. Tobacco Co., 880 F.2d 1520, 1527 (2d Cir. 1989)); see also 2013 Order at 5 & n.4 (applying New York law to substantive matters in instant case).[5] "The attorney-client privilege protects confidential communications between a lawyer and client relating to legal advice sought by the client." Egiazaryan, 290 F.R.D. at 428 (quoting In re Nassau Cnty. Grand Jury Subpoena Duces Tecum Dated June 24, 2003, 830 N.E.2d 1118, 1126 (N.Y. 2005)) (citation omitted). New York State's codification of the attorney-client privilege provides:

[A]n attorney or his or her employee, or any person who obtains without the knowledge

---

[5] The parties do not contest that New York's attorney-client privilege rule applies to this case. Mot. Compel ¶ 4; Dkt. No. 66 at 3. In their filings, however, both parties cite cases applying the federal attorney-client privilege rule. See Mem.; Resp. Judge Peebles considered these cases in his orders. See Nov. Att'y-Client Privilege Order; Dec. Att'y-Client Privilege Order. Though there are some differences between the New York and federal attorney-client privilege rules, see Egiazaryan, 290 F.R.D. at 432 (citing cases), "New York law governing attorney-client privilege is generally similar to accepted federal doctrine," Bank of Am., N.A. v. Terra Nova Ins. Co. Ltd., 211 F. Supp. 2d 493, 495 (S.D.N.Y. 2002) (citation omitted). Therefore, the Court will consider these cases to the extent they are consistent with New York's attorney-client privilege rule.

of the client evidence of a confidential communication made between the attorney or his or her employee and the client in the course of professional employment, shall not disclose, or be allowed to disclose such communication, nor shall the client be compelled to disclose such communication.

N.Y. C.P.L.R. § 4503(a)(1). In order for the privilege to apply, "the communication itself must be 'primarily or predominantly of a legal character.'" Egiazaryan, 290 F.R.D. at 428 (quoting Rossi v. Blue Cross & Blue Shield of Greater N.Y., 540 N.E.2d 703, 706 (N.Y. 1989)). Such documents are entitled to privilege even if they also contain non-legal communications. Rossi, 540 N.E.2d at 706. "The critical inquiry is whether, viewing the lawyer's communication in its full content and context, it was made in order to render legal advice or services to the client." Egiazaryan, 290 F.R.D. at 428 (quoting Spectrum Sys. Int'l Corp. v. Chem. Bank, 581 N.E.2d 1055, 1061 (N.Y. 1991)).

The attorney-client privilege is waived when a communication is voluntarily disclosed to a third party. People v. Osorio, 549 N.E.2d 1183, 1185 (N.Y. 1989) (citation omitted); see also Green v. Beer, No. 06 CIV. 4156, 2010 WL 3422723, at *2 n.2 (S.D.N.Y. Aug. 24, 2010) (citing Adlman, 68 F.3d at 1499; Allied Irish Banks, 240 F.R.D. at 103; People v. Mitchell, 448 N.E.2d 121, 123 (N.Y. 1983)). One exception to this rule applies where the third party facilitates communication between the attorney and client, or acts as either's agent. Egiazaryan, 290 F.R.D. at 430 ("An exception exists where 'communications [are] made to counsel through a hired interpreter, or one serving as an agent of either attorney or client to facilitate communication.'") (quoting Osorio, 549 N.E.2d at 1186)); see also Green, 2010 WL 3422723, at *2 ("An exception to this principle applies where the purpose of the communication [to a third party] is to assist the attorney in rendering advice to the client'") (quoting Adlman, 68 F.3d at 1499). Another exception applies in the case of the common-interest privilege, which protects "communications [that] pass[] from one party to the attorney for another party where a joint defense effort or strategy has been decided upon

and undertaken by the parties and their respective counsel." Egiazaryan, 290 F.R.D. at 433 (quotation omitted). The burden of proving that the attorney-client privilege applies, and has not been waived, rests with the party asserting privilege. Id. (citing Mitchell, 448 N.E.2d at 122 and John Blair Commc'ns, Inc. v. Reliance Capital Grp., 582 N.Y.S.2d 720, 721 (App. Div. 1992)).

The University argues that attorney-client communications disclosed to Sard Verbinnen are entitled to privilege under the agency exception, see Mem. at 11-13, and that communications shared with the University's Board of Trustees are protected from disclosure by the common-interest privilege, id. at 14-15.

### 2. Communications Involving Sard Verbinnen

In order for the agency exception to apply, the party claiming privilege must demonstrate that the client: (1) had "a reasonable expectation of confidentiality under the circumstances, and (2) [that] disclosure to the third party was necessary for the client to obtain informed legal advice." Egiazaryan, 290 F.R.D. at 431 (quoting Don v. Singer, 2008 WL 2229743, at *5 (N.Y Sup. Ct. 2008)); see also Nat'l Educ. Training Grp., Inc. v. Skillsoft Corp., No. M8-85, 1999 WL 378337, at *3 (S.D.N.Y. June 10, 1999) (citing cases). "[T]he 'necessity' element means more than just useful and convenient, but rather requires that the involvement of the third party be nearly indispensable or serve some specialized purpose in facilitating the attorney-client communications." Nat'l Educ. Training Grp., Inc, 1999 WL 378337, at *4 (citing cases). "'Thus, where the third party's presence is merely useful but not necessary, the privilege is lost.'" Egiazaryan, 290 F.R.D. at 431 (quoting Allied Irish Banks, P.L.C., 240 F.R.D. at 104).

Judge Peebles determined, with two exceptions, that the communications involving Sard Verbinnen were not disclosed in order to facilitate legal advice between the University and its

attorneys, and therefore were not protected under the attorney-client privilege. Dec. Att'y-Client Privilege Order at 13-14. The University challenges this determination, arguing that the Affidavits it provided from counsel establish that Sard Verbinnen was retained in order to assist with counsel's legal services to the University. <u>See</u> Mem. at 11-12. Specifically, the University argues that due to heightened media scrutiny surrounding the investigation, it determined that its attorneys required public relations assistance. <u>Id.</u> at 13. The University also asserts that Sard Verbinnen aided its attorneys in providing legal advice to the University on issues of communication and publicity, and that "Sard Verbninnen 'conferred frequently' with Debevoise, 'preparing drafts of press releases and other materials which incorporated the lawyers' advice.'" <u>Id.</u> (citations omitted). Because Sard Verbinnen's work was "directed at handling the client's legal problems," <u>id.</u> (internal citation and quotation marks omitted), the University argues that attorney-client communications involving Sard Verbinnen should be privileged, <u>id.</u> Plaintiff responds that Sard Verbinnen performed generalized public relations work that was broader than the services provided in the cases on which the University relies, and that communications were not disclosed to them in order to assist in providing legal advice; therefore those documents are not entitled to privilege. Resp. at 16-18.[6]

The University's argument relies primarily on <u>In re Grand Jury Subpoenas dated Mar. 24, 2003</u>, 265 F. Supp. 2d 321, 328 (S.D.N.Y. 2003). <u>See</u> Mem. at 12-13. In that case, "a public relations firm's communications were covered by the [attorney-client] privilege in the context of an

---

[6] Plaintiff also argues that because the Affidavits on which the University relies to assert privilege were not submitted to the court until after the first Order on this issue was filed, they are untimely and should not be considered. <u>See</u> Resp. at 15-16. However, because Judge Peebles considered these Affidavits and still found that the documents in question were not covered by attorney-client privilege, and the Court affirms that decision, *infra*, the Court will not address the issue of whether these submissions were timely.

investigation that had generated 'intense press interest and extensive coverage for months,'" Mem. at 12 (quoting In re Grand Jury Subpoenas, 265 F. Supp. 2d at 323), and where attorneys hired a public relations firm "out of a concern that 'unbalanced and often inaccurate press reports . . . created a clear risk that the prosecutors and regulators conducting the various investigations would feel public pressure to bring some kind of charge,'" In re Grand Jury Subpoenas, 265 F. Supp. 2d at 323. The University argues that the instant case is analogous to In re Grand Jury Subpoenas because the University faced heavy media attention surrounding the sexual abuse allegations against Plaintiff's husband, the police announced that they planned to investigate, and both the District Attorney's and U.S. Attorney's offices issued subpoenas regarding the investigation. Mem. at 12.

Though the instant case shares some similarities with In re Grand Jury Subpoenas, including intense media scrutiny and the potential for criminal charges, Judge Peebles did not err in declining to follow the outcome of that case. Even though the University's Affidavits state that the University's attorneys consulted with Sard Verbinnen in order to shape media coverage to avoid prosecution, see generally French Aff; Hogan Aff., Judge Peebles reviewed the withheld documents *in camera* and found that with limited exceptions, they did not contain communications related to obtaining legal advice. Dec. Att'y-Client Privilege Order at 13; see also Nov. Att'y-Client Privilege Order. at 4-5 ("In this case, the communications between the University, its law firm, and/or Sard Verbinnen do not reveal that Sard Verbinnen was included in the communications for the purpose of obtaining legal advice. . . . None of the communications that involve Sard Verbinnen appear to have anything to do with legal advice.").

In so ruling, Judge Peebles applied the correct legal standard—that is, in order for the agency exception to apply, the communications disclosed to a third party must be *necessary* to facilitate

attorney-client communications and for the provision of legal advice. See McNamee v. Clemens, No. 09 CV 1647, 2013 WL 6572899, at *5 (E.D.N.Y. Sept. 18, 2013) ("[T]he 'critical inquiry' is whether the communication with the person assisting the lawyer was made in confidence and for the purpose of obtaining legal advice.") (citing cases) (internal citations omitted). If public relations support is merely helpful, but not necessary to the provision of legal advice, the agency exception does not apply. See id. ("[I]t is not sufficient that communications with a PR Firm 'prove important to an attorney's legal advice to a client.'") (citation omitted); Haugh v. Schroder Inv. Mgmt. N. Am. Inc., No. 02 CIV.7955, 2003 WL 21998674, at *3 (S.D.N.Y. Aug. 25, 2003) ("Some attorneys may feel it is desirable at times to conduct a media campaign, but that decision does not transform their coordination of a campaign into legal advice"). Courts vary in their application of this rule, often based on an assessment of whether a public relations professional in fact facilitated legal counsel, or merely provided ordinary public relations advice. See, e.g., Egiazaryan, 290 F.R.D. at 431-32 (rejecting applicability of In re Grand Jury Subpoenas where public relations firm provided ordinary public relations advice in high profile case, rather than assisting directly with a "lawyer's public advocacy on behalf of the client" that "was necessary to achieve a circumscribed litigation goal"); O'Hara, 241 F.R.D. at 141 (stating the rule that the attorney-client privilege does not extend to communications involving a public relations firm where the firm "simply provided ordinary public relations advice and assisted counsel in 'assessing the probable public reaction to various strategic alternatives, as opposed to enabling counsel to understand aspects of the client's own communications that could otherwise be appreciated in the rendering of legal advice.'") (citation omitted). Therefore, Judge Peebles did not err in finding that because the communications disclosed to Sard Verbinnen did not relate to the provision of legal advice, they were not entitled to

21

protection from disclosure under the attorney-client privilege.[7]

### 3. Communications Involving the Board of Trustees

The common-interest privilege "serves to protect the confidentiality of communications passing from one party to the attorney for another party where a joint defense effort or strategy has been decided upon and undertaken by the parties and their respective counsel." Egiazaryan, 290 F.R.D. at 433 (citations omitted). "There are two elements of the common interest rule[:] (1) the party who asserts the rule must share a common legal interest with the party with whom the information was shared and (2) the statements for which protection is sought were designed to further that interest." Allied Irish Banks, P.L.C., 252 F.R.D. at 171 (citing Gulf Islands Leasing, Inc. v. Bombardier Capital, Inc., 215 F.R.D. 466, 471 (S.D.N.Y.2003) and Johnson Matthey, Inc. v. Research Corp., No. 01 CIV. 8115, 2002 WL 1728566, at *6 (S.D.N.Y. July 24, 2002)).[8]

In order for a communication to "be protected under the common interest rule, the communication must meet the elements of the attorney-client privilege." Allied Irish Banks, P.L.C., 252 F.R.D. at 171 (citing Gulf Islands Leasing, 215 F.R.D. at 470). Therefore, in order for the common-interest privilege to apply, "'[t]here must be a substantial showing by parties attempting to

---

[7] The University curiously argues that Judge Peebles provided no legal support for his decision. See Mot. at 11. Contrary to the University's assertions, however, Judge Peebles cited correct principles of law and explained his reasoning. See generally Nov. Att'y-Client Privilege Order; Dec. Att'y-Client Privilege Order. Furthermore, other courts have declined to extend In re grand Jury Subpoenas to cases applying the New York attorney-client privilege rule on the ground that New York's agency exception is narrower than the federal rule applied in that case. See Egiazaryan, 290 F.R.D. at 432 (citing cases). Therefore, Judge Peebles did not abuse his discretion in declining to rely on this specific case.

[8] As an exception to the waiver of attorney-client privilege, New York law also applies to the common-interest privilege. However, "New York courts applying the common interest rule to civil proceedings have often looked to federal case law for guidance." Egiazaryan, 290 F.R.D. at 434 (citations omitted).

invoke the protections of the privilege of the need for a common defense [as opposed to the mere existence of a] common problem.'" Id. (quoting <u>Finkelman v. Klaus</u>, 2007 WL 4303538, at *4 (N.Y. Sup. Ct. Nov. 28, 2007)) (bracketing in original). "[C]ase law has repeatedly held that communications regarding business matters—even where litigation is pending or imminent—do not qualify for protection from discovery under the common interest rule." Id. (citing Gulf Islands Leasing, 215 F.R.D. at 472); see also Egiazaryan, 290 F.R.D. at 434 (finding that "a 'personal or business oriented' interest shared with another party is insufficient" to establish that the common-interest privilege applies) (citing <u>Yemini v. Goldberg</u>, 821 N.Y.S.2d 384 (Sup. Ct. 2006)).[9]

Judge Peebles found that the University had not met its burden to show that certain withheld documents were protected by the common-interest privilege because it had never identified which individuals listed in the Privilege Log were Board members. Dec. Att'y-Client Privilege Order at 9-10, 12-13. Therefore, after reviewing the documents *in camera*, Judge Peebles found that the University had not met its burden to show that the privilege applied to the withheld documents. <u>Id.</u> at 12-13. After reviewing the Privilege Log and subsequent filings, the Court finds that Judge Peebles did not err in finding that the University had not met its burden to show that the common-

---

[9] There is some tension in New York law regarding whether "reasonably anticipated litigation" is required for the common-interest privilege to apply. <u>Compare</u> Allied Irish Banks, P.L.C., 252 F.R.D. at 171 (citing cases stating this requirement), <u>with</u> <u>Ambac Assur. Corp. v. Countrywide Home Loans, Inc.</u>, 998 N.Y.S.2d 329, 334 (App. Div. 2014) ("We acknowledge that a line of New York cases requires pending or reasonably anticipated litigation for the common-interest privilege to apply . . . However, the better policy requires that we diverge from this approach."). However, because the Court affirms Judge Peebles's finding that the University did not meet other aspects of its burden to show that the common-interest privilege applied to withheld documents, the Court need not address this issue.

interest privilege applied.[10]

Courts generally require the party asserting privilege to produce a privilege log. "Without an adequately detailed privilege log, the courts are hamstrung in attempting to decipher the presence and extent of the claimed privilege." O'Hara, 241 F.R.D. at 130. "To constitute an acceptable privilege log, at a minimum, it should provide facts that would establish each element of the claimed privilege as to each document." Id. (citing Struogo, 199 F.R.D. at 519). If a party's privilege log does not provide sufficient information to support the privilege asserted, a court may deny the claim of privilege. Id. (citing Johnson v. Bryco Arms, No. 02 CV 3029, 2005 WL 469612, at *3-4 (E.D.N.Y. Mar. 1, 2005) and United States v. Constr. Prods. Research, Inc., 73 F.3d 464, 474 (2d Cir. 1996)). In general, a privilege log should:

> identify each document and the individuals who were parties to the communications, providing sufficient detail to permit a judgment as to whether the document is at least potentially protected from disclosure. Other required information, such as the relationship between . . . individuals not normally within the privileged relationship, is then typically supplied by affidavit or deposition testimony. Even under this approach, however, if the party invoking the privilege does not provide sufficient detail to demonstrate fulfillment of all the legal requirements for application of the privilege, his claim will be rejected.

Constr. Prods. Research, Inc., 73 F.3d at 473 (quoting Bowne of N.Y. City, Inc. v. AmBase Corp., 150 F.R.D. 465, 474 (S.D.N.Y. 1993)).

---

[10] Judge Peebles only considered two documents with respect to the common-interest privilege, noting that the University only asserted that privilege with respect to two documents. Dec. Att'y-Client Privilege Order at 12 n.4 (citing Mot. Recons. at 13). The University argues that it asserted the common-interest privilege with respect to six documents, citing a Letter Brief submitted to the court after the Motion for reconsideration was filed, asking Judge Peebles to consider redactions to an additional four documents. Dkt. No. 81. The Court will consider the University's arguments with respect to all six documents over which it now asserts the privilege. The Court notes, however, that Judge Peebles did consider whether these additional documents were protected by the attorney-client privilege generally. See Dec. Att'y-Client Privilege Order at 4.

The University's Privilege Log does not identify the roles of the individuals listed in the log. See generally Privilege Log. Despite an earlier ruling from Judge Peebles that the Privilege Log was insufficient, see Nov. Att'y-Client Privilege Order at 5-6, the University still has not identified which individuals listed in the Privilege Log are members of the Board of Trustees, see Dec. Att'y-Client Privilege Order at 10 & n.2; see generally Mem. The University argues that although the Privilege Log did not indicate which recipients of specified communications were Board members, "the University's privilege log clearly indicated that each recipient of the six communications are within the common-interest privilege shared by the University and its Board." Mem. at 15.

The University's argument is unavailing, since the Privilege Log not only fails to identify members of the Board, but also fails to indicate the role of any person listed, or to specifically invoke the common-interest privilege. See generally Privilege Log. All six communications to which the University argues the common-interest privilege applies are described in the Privilege Log as "Email reflecting legal advice re media coverage," and invoke attorney-client privilege and the work-product doctrine generally as the basis for withholding or redacting documents. See id. at 5. The Privilege Log does not provide "sufficient detail to permit a judgment as to whether the document is at least potentially protected from disclosure" based on the common-interest privilege. See Constr. Prods. Research, Inc., 73 F.3d at 473. Furthermore, with respect to members of the Board, the University never submitted evidence regarding "[o]ther required information, such as the relationship between . . . individuals not normally within the privileged relationship." See id. The Court therefore finds that Judge Peebles did not err in finding that the University had not met its burden to show that the

common-interest privilege applies to documents shared with the Board.[11]

## V. CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that Judge Peebles's October 16, 2014 Decision and Order (Dkt. No. 72) is

**AFFIRMED**; and it is further

**ORDERED**, that Judge Peebles's December 24, 2014 Decision and Order (Dkt. No. 83) is

**AFFIRMED**; and it is further

**ORDERED**, that Syracuse University's Motion (Dkt. No. 84) to set aside those Decision and

Orders is **DENIED**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Memorandum-Decision and

Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

DATED:    May28, 2015
            Albany, NY

Lawrence E. Kahn
U.S. District Judge

---

[11] The University also argues regarding the common-interest privilege that "Plaintiff did not offer any facts to the contrary and since there is no factual dispute that the communications at issue were sent only to recipients within the common-interest privilege established by the University, Judge Peebles's concerns could be easily addressed through a revised privilege log." Mem. at 15. However, Judge Peebles was not required to allow the University to submit a revised privilege log, and his decision to review the withheld documents *in camera* rather than accept a revised privilege log was not an abuse of discretion. See N.L.R.B. v. Jackson Hosp. Corp., 257 F.R.D. 302, 307 (D.D.C. 2009) ("The inadequacy of a privilege log can be remedied in four ways: [(1)] [p]ermit the party another chance to submit a more detailed log; [(2)] [d]eem the inadequate log a waiver of the privilege; [(3)] *[i]n camera* inspection of the withheld documents; or [(4)] *[i]n camera* inspection of a select sample of the withheld documents.").