IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

LAURIE J. FINE,

                    Plaintiff,

                              Civil Action No.
                              5:12-CV-0836 (DEP)

        v.

ESPN, INC., a subsidiary of Walt
Disney, Inc., *et al.*,

              Defendants.

_____

APPEARANCES:                  OF COUNSEL:

FOR PLAINTIFF:

COHEN & WILLWERTH, P.C.        LAWRENCE H. FISHER, ESQ.
One Oxford Centre             KEVIN W. TUCKER, ESQ.
301 Grant Street, Suite 4300
Pittsburgh, PA 15219

FOR DEFENDANTS:

LEVINE SULLIVAN KOCH          NATHAN E. SIEGEL, ESQ.
& SCHULZ                      THOMAS CURLEY, ESQ.
1899 L Street NW, Suite 200   PAUL J. SAFIER, ESQ.
Washington, D.C. 20036        ELIZABETH SEIDLIN-BERNSTEIN, ESQ.
                              RACHEL F. STRON, ESQ.


DAVID E. PEEBLES
CHIEF U.S. MAGISTRATE JUDGE

<u>DECISION AND ORDER</u>

This is a defamation action brought by plaintiff Laurie J. Fine, the wife of a former Syracuse University assistant men's basketball coach, against defendant ESPN, Inc., and two of its employees, a reporter and a producer. Plaintiff's complaint is directed toward statements contained in three stories published by ESPN on or about November 27, 2011, suggesting that she was aware that her husband had sexually abused minor males but did nothing to prevent it, and that she herself had sex with one of the males. Plaintiff contends that the statements at issue were false and the product of irresponsible journalism following a flawed and inadequate investigation.

Now that discovery is closed, defendants have filed two motions. The first seeks a finding by the court that, at the relevant times, plaintiff was a limited purpose public figure and therefore faces a heightened burden of proof with respect to her defamation claim. The second requests the entry of summary judgment dismissing plaintiff's claims. For the reasons set forth below, I find that, at the time of publication, plaintiff was a limited purpose public figure, and, further, no reasonable factfinder could conclude that defendants acted with actual malice when publishing the three stories at issue. Accordingly, summary judgment will be entered dismissing plaintiff's complaint.

I.    <u>BACKGROUND</u>[1]

Plaintiff is married to Bernie Fine, who, for many years, served as an assistant coach for the Syracuse University men's basketball team. Dkt. No. 1 at 2, 4. As the wife of Bernie Fine, plaintiff was a known and prominent figure in the Syracuse community, having regularly attended basketball-related and charity events and made numerous appearances on local television and radio programs. *Id.* at 4; Dkt. No. 97-3 at 4, 10-11, 14, 16, 23-24. Bernie Fine was fired by Syracuse University in November 2011, after allegations of child molestation against him surfaced. Dkt. No. 45-15 at 2.

ESPN is a news organization that focuses on sport-related content. Dkt. No. 1 at 2-3. In 2003, Robert "Bobby" Davis, a former ball boy for the Syracuse University men's basketball team, sent an e-mail to *Outside The Lines*, ESPN's news magazine program, alleging that he had been sexually abused by Bernie Fine. Dkt. No. 98-30 at 45. Following receipt of that e-mail, the program's anchor, Bob Ley, spoke with Davis and concluded that the story sounded credible. Dkt. No. 98-69 at 2. Defendant Arthur Berko, a producer at ESPN, and defendant Mark Schwarz, who had

_____

[1]    In light of the procedural posture of the case, the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in plaintiff's favor. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

previously reported on a story regarding abuse of a former NHL hockey player by a coach, were assigned to investigate the allegations made by Davis. *Id.*; Dkt. No. 98-27 at 1; Dkt. No. 98-28 at 2; Dkt. No. 98-59 at 2.

At the relevant times, defendants Schwarz and Berko were supervised by Coordinating Producer Tim Hays, who, in turn, reported to Vince Doria, ESPN's former Senior Vice President and Director of News. Dkt. No. 98-59 at 2; Dkt. No. 98-64 at 2. During the course of their investigation into the allegations against Bernie Fine, defendants Schwarz and Berko interviewed Davis on several occasions, both by telephone and on camera. Dkt. No. 98-27 at 2; Dkt. No. 98-28 at 2; *see also* Dkt. Nos. 98-29 – 98-34. In those interviews, Davis stated that Bernie Fine began sexually molesting him when he was in middle school and plaintiff was aware that her husband had engaged in sexual conduct with Davis, adding that plaintiff also had a sexual relationship with him when he was younger.[2] Dkt. No. 98-30 at 31-32, 63-65; Dkt. No. 98-32 at 19-20.

During the course of the investigation in 2003, Davis provided defendants Schwarz and Berko with a copy of a tape recording of a telephone conversation that occurred in October 2002 between him and

---

[2]    Plaintiff disputes that Davis was under the age of seventeen, the age of consent in New York, when she allegedly became aware of her husband having sexual contact with Davis, and intimates that the conduct was consensual in nature, and thus not criminal. *See* Dkt. No. 111-1 at 18-21.

plaintiff.[3] Dkt. No. 98-27 at 2; Dkt. No. 98-28 at 3; Dkt. No. 98-30 at 33-34. Defendants Schwarz and Berko, as well as Hays, each listened to the tape recording and decided it strongly supported the conclusions that plaintiff likely knew her husband had sexually molested Davis and other males while they were minors, but did not intervene, and that she herself had a sexual relationship with Davis, as well. Dkt. No. 98-27 at 2; Dkt. No. 98-28 at 2-3; Dkt. No. 98-64 at 2. Doria also listened to the tape, and while he "thought [it] was a powerful piece of evidence that in [his] view added credibility to Davis' allegations," he found the recording somewhat ambiguous. Dkt. No. 98-59 at 3.

Defendants Schwarz and Berko continued their investigation into the allegations by interviewing Danielle Roache, a babysitter for the Fines' children; Anthony Rinaldi, a former neighbor of the Fines; and Cathy Pitts, Davis's mother.[4] Dkt. No. 98-27 at 2; Dkt. No. 98-28 at 7-8. According to

---

[3]     A transcript of that tape recording was submitted as an exhibit earlier in the action in connection with ESPN's motion for judgment on the pleadings. Dkt. No. 45-12.

[4]     The parties have informally agreed that the court may consider transcripts of interviews conducted by defendants Schwarz and Berko in lieu of, and as the functional equivalent of, transcripts of depositions of those witnesses for purposes of this motion. Unfortunately, however, the parties are not in agreement as to the scope and extent of that arrangement, and specifically whether it also includes additional, otherwise inadmissible evidence, including (1) a state-court libel complaint filed by Bernie Fine, in which he denies Davis' allegations; (2) a newspaper article attributing a quote to ESPN President John Skipper; and (3) certain e-mail communications. This outstanding

Rinaldi, after he politely rebuffed what he interpreted as overtures by plaintiff to begin a romantic relationship, plaintiff stated, "Well, you know, what do you think all of these boys are doing over here with my husband over here? You know, do you think they're just up here just visiting?" Dkt. No. 98-35 at 2. When Rinaldi replied that he did not know, plaintiff responded, in substance, "Well, what do you think they're doing? He's up screwing them[.]" *Id.*

During their investigation, defendants Schwarz and Berko also interviewed experts in the field of child abuse, including Kenneth Lanning, who spent thirty years supervising the Federal Bureau of Investigation task force on sexual abuse, and Mark Serrano, a leader in the Survivors Network of those Abused by Priests. Dkt. No. 98-27 at 2; Dkt. No. 98-28 at 15. Defendants Schwarz and Berko also attempted to find other possible victims of Bernie Fine's abuse, including Ludwig Vita, who denied experiencing any abuse, and Michael Lang, Davis' older step-brother, who, in 2003, stated he believed his brother was abused but denied that he, too, was sexually abused by Bernie Fine.[5] Dkt. No. 98-28 at 10-11.

---

dispute need not be resolved by the court because I have not relied on any of the disputed evidence in rendering decisions on the issues now before me.

[5]     Lang advised defendant Schwarz, however, that, like Davis, he had sexual contact with plaintiff when he was a teenager. Dkt. No. 98-28 at 11.

As a result of their investigation in 2003, Schwarz, Berko, Hays, and Doria all formed a belief that Davis was credible, including with respect to his allegations of abuse by Bernie Fine, plaintiff's knowledge of the abuse, and his sexual relationship with plaintiff. Dkt. No. 98-27 at 4; Dkt. No. 98-28 at 11; Dkt. No. 98-59 at 4; Dkt. No. 98-64 at 3. Doria made a decision, however, not to publish Davis' allegations until ESPN could locate an additional source with personal, first-hand knowledge of sexual abuse by Bernie Fine.[6] Dkt. No. 98-59 at 4.

Defendants revisited the allegations against Bernie Fine in November 2011, following a news report that Penn State assistant football coach Jerry Sandusky had been indicted for sexual abuse. Dkt. No. 98-28 at 13. While defendant Schwarz was on location at the Penn State campus reporting on the Sandusky story for ESPN, Lang called him and stated that, despite his denial years earlier, he, like Davis, had been subjected to sexual abuse by Bernie Fine. *Id.* at 14. During additional phone calls over the next several days, Lang also told defendant Schwarz, as he did in 2003, that plaintiff

---

[6]     During the course of the initial investigation, defendant Schwarz took one hundred pages of handwritten notes, and ESPN filmed approximately four hours of on-camera interviews with key sources and experts on sexual abuse.

performed oral sex on him when he was a teenager "well under 18 years old." *Id.*

After consulting with experts in the field, including Robert Shoop, from Kansas State University, and recontacting Serrano, defendants Schwarz and Berko concluded that Lang was being truthful in his most recent revelations. Dkt. No. 98-27 at 4-5; Dkt. No. 98-28 at 14-15. Accordingly, they proceeded further with their investigation into the claims against Bernie Fine, conducting on-camera interviews of both Davis and Lang on November 17, 2011. Dkt. No. 98-27 at 5; Dkt. No. 98-28 at 16; *see also* Dkt. Nos. 98-44, 98-45. During his interview, Lang stated that Bernie Fine touched his penis on approximately fifteen-to-twenty occasions when he was between the ages of thirteen and fifteen. Dkt. No. 98-44 at 11, 14-15. Despite Lang's earlier denials of having been abused by Bernie Fine, Doria, Bray, and Hays believed that Lang was then being truthful. Dkt. No. 98-50 at 3; Dkt. No. 98-59 at 5; Dkt. No. 98-64 at 4.

On or about November 17, 2011, ESPN learned that the Syracuse City Police Department was investigating allegations against Bernie Fine.[7]

_____

[7] By this time, investigators with the Syracuse City Police Department had arrived at the conclusion that Bernie Fine had sexually molested at least three minors, including Davis and Lang, and possibly a fourth. It was publicly reported on November 25, 2011, that, in connection with various investigations being conducted by law enforcement at the time, federal authorities had obtained and executed search warrants for the Fines'

Dkt. No. 98-28 at 17; Dkt. No. 98-50 at 3; Dkt. No. 98-64 at 4. On that same day, after reviewing all of the on-camera interviews conducted by defendants Schwarz and Berko with Davis, Lang, and Roache, Bray concluded, and Doria agreed, that it was appropriate to publish a story regarding Davis's allegations against Bernie Fine. Dkt. No. 98-50 at 3-4; Dkt. No. 98-59 at 5-6. That evening, ESPN aired its first report concerning Davis' allegations against Bernie Fine; the story, however, did not mention any claims regarding plaintiff. *Id.*; Dkt. No. 45-11.

After learning that law enforcement authorities were finding the accounts given by Davis and Lang to be credible, defendants Schwarz and Berko continued their investigation with an eye toward preparing a story based upon the October 2002 tape-recorded conversation between Davis and plaintiff. Dkt. No. 98-27 at 5-6; Dkt. No. 98-28 at 17-18. At the direction of his editors, defendant Schwarz re-interviewed Roach and Davis, and specifically discussed the tape recording with them. Dkt. No. 98-28 at 17-18; *see also* Dkt. Nos. 98-47, 98-48. During his re-interview, Davis provided

---

home and Bernie Fine's office. Dkt. No. 98-27 at 6; Dkt. No. 45 at 4-7, 15-18, 37-39, 43, 50-51, 53. Onondaga County District Attorney William Fitzpatrick concluded that the tape recorded conversation from October 2002 between plaintiff and Davis was "devastating" evidence against Bernie Fine, and, were it not for the statute of limitations, plaintiff herself might face charges of endangering the welfare of a child based upon her admissions made during the tape recorded conversation. Dkt. No. 45-13 at 2-3, 15-16.

more details regarding his sexual relationship with plaintiff. Dkt. No. 98-48 at 20-21. In addition, in an effort to confirm that the voice on the October 2002 recording was plaintiff, ESPN sought the opinion of a third party, identified as Christopher Kikel, whose credentials are disputed by the parties.[8] Dkt. No. 98-50 at 4-5. Based upon those further investigatory efforts, defendant Schwarz concluded that the tape was a complete and accurate recording of a conversation between Davis and plaintiff in 2002. Dkt. No. 98-28 at 18.

On or about November 19, 2011, before publishing any story regarding the allegations against plaintiff, ESPN attempted to obtain comments from both Bernie and Laurie Fine. Dkt. No. 98-50 at 5. Bray first assigned an ESPN producer to wait outside the Fines' home to no avail, and Doria thereafter instructed an ESPN reporter to contact the Fines' attorney for comment. *Id.*; Dkt. No. 98-59 at 7; Dkt. No. 98-66 at 2. Those efforts were unsuccessful. *Id.*

---

[8]     While defendants characterize Kikel as a "voice recognition expert," Dkt. No. 98-50 at 4-5, plaintiff contests this assertion. Dkt. No. 111-2 at 24. Plaintiff also disputes defendants' contention that Kikel concluded that the voice on the 2002 recording matched the voice in a clip from You Tube purporting to be plaintiff. *Id.* at 24-25. It is worth noting that, when the action was commenced, plaintiff alleged that the tape recording provided by Davis was "admittedly doctored, substantially inaudible, and entirely speculative." Dkt. No. 1 at 79. Nevertheless, plaintiff now concedes the authenticity of the tape recording from October 2002 and that it appears to be an accurate and complete recording of her conversation with Davis at that time. Dkt. No. 98-4 at 190-91.

As a result of its investigation, on November 27, 2011, ESPN published three stories concerning the allegations against plaintiff. Dkt. No. 98-59 at 8. That morning, after the *Syracuse Post-Standard* reported in its newspaper that law enforcement was investigating the allegations by Zach Tomaselli against Bernie Fine, ESPN broadcasted a video story subtitled "Bernie Fine's wife had abuse concerns" and published a written article on ESPN.com entitled *Bernie Fine's wife had abuse concerns. Id.*; *see also* Dkt. Nos. 45-10, 45-14, 45-16. Following the announcement that evening that Bernie Fine had been fired by Syracuse University, ESPN published a second article on ESPN.com entitled *Bernie Fine fired amid abuse allegations.* Dkt. No. 98-27 at 6; Dkt. No. 98-28 at 18-19; Dkt. No. 45-15; Dkt. No. 98-59 at 8. The video story was initially drafted by defendants Schwarz and Berko and was then reviewed and revised numerous times by Hays, Bray, Doria, and Ley. Dkt. No. 98-27 at 5-6; Dkt. No. 98-28 at 18; Dkt. No. 98-50 at 5; Dkt. No. 98-59 at 7-8. The text version of the video story, *Bernie Fine's wife had abuse concerns*, was drafted by Bray due to the story's significance. Dkt. No. 98-50 at 5-6. Bray's draft was reviewed by defendants Schwarz and Berko, and additionally by David Kraft, a senior editor within the ESPN digital news department. *Id.*; *see also* Dkt. No. 98-27 at 5-6; Dkt. No. 98-28 at 18; Dkt. No. 98-68 at 2.

In December 2011, ESPN's editorial board addressed the abuse allegations lodged initially by Davis during a regularly scheduled monthly meeting. Dkt. No. 98-59 at 9; Dkt. No. 98-73 at 2. At the meeting, no one expressed concerns about the reporting pertaining to the October 2002 tape recording or plaintiff. Dkt. No. 98-59 at 10; Dkt. No. 98-73 at 4. The reporting was also reviewed by an independent ombudsman retained by ESPN, who found no fault in the reporting, but criticized ESPN for not "pursu[ing] two more lines of inquiry" in 2003, including contacting the Syracuse Police Department and Syracuse University. Dkt. No. 98-63.

II.    DISCUSSION

    A.    Summary Judgment Standard

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004). A fact is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at

248; *see also Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson*, 477 U.S. at 250 n.4; *Sec. Ins. Co.*, 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255; *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002); *see also Anderson,* 477 U.S. at 250 (finding summary judgment

appropriate only when "there can be but one reasonable conclusion as to the verdict").

### B.    Limited Purpose Public Figure

In their first motion, defendants argue that, for purposes of the law of defamation and the appropriate standard to be applied in adjudicating her claims, plaintiff is properly regarded as a limited purpose public figure. *See generally* Dkt. No. 97-1. In response, plaintiff contends that, notwithstanding the fact that she had enjoyed some degree of public notoriety as the wife of a former assistant basketball coach for a prominent university and the fact that she has made several media appearances, she does not meet the definition of a limited public figure. *See generally* Dkt. No. 110. This motion presents a pivotal, threshold issue that will shape what plaintiff must prove in order to prevail in her defamation claim. Specifically, resolution of the question will determine whether plaintiff will have to satisfy the enhanced burden of demonstrating, by clear and convincing evidence, that defendants acted with actual malice in publishing the three stories at issue or, instead, the case will be governed by the less onerous, gross irresponsibility

standard delineated by the New York Court of Appeals in *Chapadeau v. Utica Observer-Dispatch, Inc.*, 38 N.Y.2d 196 (1975).[9]

### 1.    Limited Purpose Public Figure Standard

Defamation suits like the one now before the court underscore the tension that exists between society's interest in fostering the freedom of the media to report on matters of general concern and the interests of individuals in protecting their reputations. *See Gertz v. Robert Welch, Inc.*,

---

[9]      The New York Court of Appeals defined the parameters of its holding in *Chapadeau* as follows:

> We now hold that within the limits imposed by the Supreme Court where the content of the article is arguably within the sphere of legitimate public concern, which is reasonably related to matters warranting public acquisition, the party defamed may recover; however, to warrant such recovery he must establish, by a preponderance of the evidence, that the publisher acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties.

*Chapadeau*, 38 N.Y.2d at 199. In its subsequent decision in *Gaeta v. N.Y. News*, 62 N.Y.2d 340 (1984), the New York Court of Appeals acknowledged the heightened standard established in *Chapadeau*, observing that, "[i]n striking a balance between the rights of private citizens to be protected against defamation and constitutional guarantees of free speech and free press, this court in *Chapadeau* imposed a higher standard of culpability when defamatory statements involve matters of genuine public concern." *Gaeta*, 62 N.Y.2d at 348-49.

        Plaintiff has conceded that the disputed stories published by defendants involve matters of legitimate public concern, and that the *Chapadeau* standard therefore applies in the event she is not considered a limited purpose public figure. Under *Chapadeau*, plaintiff would be required to prove, by a preponderance of the evidence, that the defendants "acted in a grossly irresponsible manner without due consideration for standards of information gathering and dissemination ordinarily followed by responsible parties." *Chapadeau*, 38 N.Y.2d at 199.

418 U.S. 323, 342 (1974) ("Some tension necessarily exists between the need for a vigorous and uninhibited press and the legitimate interest of redressing wrongful injury."). The Supreme Court addressed these competing considerations in its seminal case, *N.Y. Times Co. v. Sullivan*, 376 U.S. 254 (1964), concluding that, in cases involving public officials, the interests of the individual are trumped by society's interest in promoting free press discussion of matters of general concern. *Biro v. Condé Naste*, 963 F. Supp. 2d 255, 269 (S.D.N.Y. 2013). Accordingly, the Court in *Sullivan* held that, to prevail, a public official alleging defamation must establish that a falsehood has been published with "actual malice."[10] *Sullivan*, 376 U.S. at 279-80; *accord, Lerman v. Flynt Dist. Co., Inc.*, 745 F.3d 123, 136 (2d Cir. 1984); *Biro*, 963 F. Supp. 2d at 269.

A few years later, the Court extended this standard to all public figures, *Curtis Publ'g Co. v. Butts*, 388 U.S. 130 (1967), and announced in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974), that individuals that "are not public figures for all purposes may still be public figures with respect to a particular controversy." *Contemporary Mission, Inc. v. N.Y. Times Co.*, 842 F.2d 612, 617 (2d Cir. 1988). As the Second Circuit has noted, the rationale for distinguishing between private and public figures in the context of

---

[10]    The actual malice standard will be addressed more fully below in part II.C.3. of this report.

defamation claims flows from the recognition "that private figures are more vulnerable to injury from defamation, since public figures have greater access to the media and thus are in a better position to contradict a lie or correct an error." *Contemporary Mission, Inc.*, 842 F.2d at 619-20. In addition, "and more important, public figures generally 'have voluntarily exposed themselves to increased risk of injury from defamatory falsehood concerning them.'" *Id.* at 620 (quoting *N.Y. Times*, 418 U.S. at 344-45).

Under the law of this circuit, to establish that a plaintiff is a limited purpose public figure, a defendant must prove that she

> (1) successfully invited public attention to [her] views in an effort to influence others prior to the incident that is the subject of litigation; (2) voluntarily injected [her]self into a public controversy related to the subject of the litigation; (3) assumed a position of prominence in the public controversy; and (4) maintained regular and continuing access to the media.

*Lerman*, 745 F.2d at 136-37; *accord, Contemporary Mission, Inc.*, 842 F.2d at 617; *Biro*, 963 F. Supp. 2d at 270. Statements regarding a limited purpose public figure are subject to enhanced protection only if relevant to the public figure's involvement in a given controversy. *Biro*, 963 F. Supp.2d at 270-71 (citing *Faigin v. Kelly*, 978 F. Supp. 420, 426 (D. N.H. 1997)). "Yet, once a plaintiff is deemed a limited purpose public figure, courts allow the heightened protections to sweep broadly, covering all statements by

defendants that are not 'wholly unrelated to the controversy.'" *Biro*, 963 F. Supp. 2d at 271 (quoting *Waldbaum v. Fairchild Publ'ns, Inc.*, 626 F.2d 1287, 1298 (D.C. Cir. 1980)). The law requires only that "the statement need be no more than generally related to a dispute in issue to qualify for protection." Robert D. Sack *Sack on Defamation: Libel, Slander, and Related Problems* ("*Sack on Defamation*") § 5:3.3 (4th ed. 2015).

The question of whether a plaintiff is a public figure is a question of law for the court to decide. *Celle v. Filipino Reporter Enters. Inc.*, 209 F.3d 163, 176-77 (2d Cir. 2000); *accord, Biro*, 963 F. Supp. 2d at 270; *see also Sack on Defamation* § 5:4.1.

### 2. Whether Plaintiff Is a Limited Public Figure

#### a. Plaintiff Successfully Invited Public Attention to Influence Others

The record amply demonstrates that plaintiff invited public attention to herself and her views regarding both the Syracuse University men's basketball team and protecting at-risk youth. In her complaint, plaintiff alleges that, as the wife of a longstanding assistant basketball coach at Syracuse University, she "became close with the Syracuse community in which the basketball program was revered," leading to opportunities to work with charitable organizations such as the Boys and Girl Club, Ronald McDonald House, and Make a Wish Foundation. Dkt. No. 1 at 4; *see also*

Dkt. No. 97-3 at 10-11, 14, 17. Plaintiff acknowledged during her deposition

that, while her status as Bernie Fine's wife placed her in the public eye, her

own individual public persona became elevated beginning in 2009, when

she "really came [into herself] and really made a name, you know, a good

name for [herself]." Dkt. No. 97-3 at 23. In March 2010, plaintiff served as a

guest reporter for at least one television news broadcast on WSYR,[11] a

local television station, in which she interviewed both Bernie Fine and

another Syracuse University men's basketball assistant coach, Mike

Hopkins, regarding the team. Dkt. No. 97-7 (DVD of March 2010

broadcasts). Plaintiff subsequently became a substitute co-anchor of *Bridge*

*Street*, a public affairs television program airing on WSYR, and also gave

multiple interviews as a guest on that same program throughout 2010 and

2011. Dkt. No. 97-4 (DVD of compilation of *Bridge Street* programming). On

that program, she regularly promoted the Syracuse University men's

basketball team from the perspective of someone who could provide the

"inside scoop." *See, e.g.,* Dkt. No. 97-8 at 3:25 – 5:37; Dkt. No. 97-9 at

48:30 – 51:10; Dkt. No. 97-10 at 12:00 – 14:05. The record reveals that

---

[11]     Defendants cite to a DVD in the record, Exhibit E to the declaration of Thomas
Curley, for the proposition that plaintiff appeared on two news broadcasts on WSYR.
Dkt. No. 97-1 at 4. A review of the clips contained on that DVD, however, reveal that
plaintiff appeared only on the second clip, which is contained in a file called "WSYR 07
Full.avi." *Id.*

plaintiff used her public visibility to encourage children to attend the "Big Orange basketball camp," the camp that, according to Davis and Lang, was used by her husband to groom them for sexual abuse. Dkt. No. 97-10 at 12:00 – 12:40.

In addition to appearing on television, plaintiff also established herself as a radio personality. During 2011, she appeared weekly on a local morning radio show to provide inside information concerning the Syracuse University men's basketball team. Dkt. No. 97-3 at 16-18. Also in 2011, plaintiff was hired to appear on a radio sports program for the purpose of offering a female perspective on sports. *Id.* at 24; *see also* Dkt. No. 1 at 4.

As she acknowledges, plaintiff has taken advantage of her public notoriety to portray herself as a philanthropist that charitable organizations competed to employ. Dkt. No. 1 at 4; Dkt. No. 97-3 at 9. Plaintiff successfully leveraged her public fame to obtain positions with organizations such as the Boys and Girls Club, Save the Kids, The Ronald McDonald House, and Make-a-Wish Foundation. Dkt. No. 1 at 4. In addition, as a guest anchor on *Bridge Street*, she once promoted a local organization that was engaged in recruiting adult mentors for at-risk middle-school-aged children, emphasizing the importance of screening potential mentors for "positive role models." Dkt. No. 97-8 at 34:39 – 39:07.

In sum, the record includes ample evidence of plaintiff's efforts to garner public attention in order to influence others and the success of those efforts. I therefore find that this prong of the limited purpose public figure test has been satisfied. *See, e.g., Celle*, 209 F.3d at 177 ("Given plaintiff Celle's own characterization of himself as a 'well known radio commentator' within Metropolitan Filipino-American community, the district court correctly held that he is a public figure.").

      b.    <u>Plaintiff Voluntarily Injected Herself Into Public Controversies Related to the Subject of the Litigation</u>

The second prong of the *Lerman* test requires the court to examine whether plaintiff voluntarily injected herself into a public controversy related to the subject of the litigation. When used in this context, the word "controversy" is both ill-defined and perhaps mildly misleading. The Second Circuit has held that the term should be defined broadly to mean "any topic upon which sizeable segments of society have different, strongly held views." *Lerman*, 745 F.2d at 138; *see also Biro*, 963 F. Supp. 2d at 272 ("A public controversy is simply 'any topic upon which sizeable segments of society have different, strongly held views,' even if the topic does 'not involve political debate or criticism of public officials.'" (quoting *Lerman*, 745 F.2d at 138) (alteration omitted)). According to Judge Sack,

> [t]he term ['public controversy'] apparently includes
> only those matters which, in the view of the Court,
> are legitimately a subject of public discussion or
> debate rather than matters of mere curiosity, or
> morbid or prurient interest. One often-cited
> discussion of this issue by the Court of Appeals for
> the District of Columbia described a public
> controversy as 'a dispute that in fact has received
> public attention because its ramifications will be felt
> by persons who are not direct participants.'

*Sack on Defamation* § 5:3.11[B] (quoting *Waldbaum*, 627 F.2d at 1296)

(footnotes omitted). The public controversy requirement, however, is not

necessarily limited to what would be considered "a classic debate." *Sack on*

*Defamation* § 5:3.11[B]. "An investigation into alleged corruption or drug

dealing, for example, could meet the test." *Id.*

In 2011, the issue of at-risk youth, and specifically those prone to

sexual abuse by adults in leadership positions, was clearly a topic of

widespread concern, particularly in view of the increasing number of reports

of sex abuse scandals by members of the clergy and athletic coaches. The

record in this case reveals several instances of plaintiff's active public

involvement in matters involving at-risk youth. One of the television

appearances by plaintiff, for example, involved her discussion of the

importance of role models and the need to properly screen adult mentors

participating in a local organization's mentoring program. Dkt. No. 97-8 at

34:39 – 39:07. During that appearance, which occurred in April 2010, the

22

following discussion occurred between plaintiff, in the role of co-anchor, and

Jason Torreano, who was being interviewed concerning the topic:

> Co-Anchor: We all know that from time to time kids can get off on the wrong track and they need to get nudged on the right track. And certainly a good way to do that is to have a mentor program. And that's where Jason Torreano, of the Center for Community Alternatives joins us . . . . Let's talk about this program. So it's a program for children, um, middle-school children, who are basically at risk, disadvantaged in some way, maybe, um, maybe they got in trouble with the law, uh, maybe they need some extra encouragement, um, and you're looking for some mentors to help get these kids on the right track. Explain.

> Mr. Torreano: That's exactly right. We are working, the Center for Community Alternatives located in Syracuse, uh, we are working very closely with the Syracuse City School District. And we are working at trying to place mentors in this community with middle school students in, uh, this community. What it boils down to is once a week, for an hour over the course of a year, you meet with the student we pair you with. Uh, and you get to know the kid, you develop a relationship with the child, and you work on, you know, you work on homework, you, you talk about life, uh, you act as a positive role model for, uh, for the kid.

> Laurie Fine: Why middle school? Because I think a lot of these kids, too, we start in elementary school, we work, sometimes by the time we get them in middle school the damage has been done unfortunately. Why middle school as opposed to getting them when they need you right in the beginning? . . . .

> Laurie Fine: And you pair them with a mentor. How would you go about getting your mentors? Do you put like a citywide callout, do you advertise, how do you get the mentors, *and how do you screen the mentors that you get*?
>
> Mr. Torreano: That's a very good question. Uh, there's a few things that we do . . . . As far as the screening is concerned, clearly that's something that also needs to be done. The Center for Community Alternatives, we do, uh, provide training, but then also, uh, people who apply to be mentors have to undergo, uh, an FBI background check. And until that comes back –
>
> Laurie Fine: *That's most important, that's most important. Because I think we're so willing sometimes as busy mothers and fathers to put our kids where it's the easiest. And that's why your program is so important because you're doing the screening to get these kids where they need to be . . . . Men like you do this kind of work which is so* important, it really is, because *these kids need positive role models to look up to so it's a great program* . . . . I could talk about this all day it's most amazing.

Dkt. No. 97-8 at 34:39-39:10 (emphasis added).

In addition, one *Bridge Street* program promoted a fundraising event at the Fines' home supporting the local Boys and Girls Club, which was described as making "such a significant impact in the lives of at-risk youth" by providing after-school programs, tutoring, mentoring, and a place where kids "feel safe." Dkt. No. 97-17 at 31:03 – 32:14. Indeed, in her complaint,

plaintiff touts her role in this regard and her "professional reputation as a non-profit fundraiser, particularly in the area of children's organizations, where her experience is almost exclusively focused." Dkt. No. 1 at 4, 28.

I note, moreover, that the status of the Syracuse University men's basketball program is consistently a matter of public discussion, and it was at the time plaintiff made public appearances promoting the program, as well as in 2011, when the allegedly defamatory statements were made. *See, e.g.,* Glenn Coin, *Hoops Inc.: The color of money is Orange for SU's $17 million basketball business*, POST-STANDARD, Mar. 19, 2010; Liz Clark, *A rivalry for the ages, and a new generation; Georgetown and Syracuse are mighty again, injecting new energy into a matchup with many memories*, WASH. POST, Jan. 25, 2010; Bill Finley, *Coach vs. Coach, Clash Without End*, N.Y. TIMES, Mar. 5, 2005; Mike Waters, *How Syracuse's move to the ACC will impact the Orange basketball program*, POST-STANDARD, Sept. 18, 2011; *Syracuse coaches again top school earnings list*, ASSOCIATED PRESS, Nov. 16, 2004. Because of the role that her husband played with respect to the program, and the fact that two of the alleged victims of her husband's abuse were ball boys for the team, her efforts to inject herself into the conversation regarding the Syracuse University men's basketball was also related to the subject of this litigation. *Cf. Guillory v. Nat'l Collegiate Athletic*

*Ass'n.*, No. B234302, 2012 WL 2831806 (Cal. Ct. of App. June 4, 2012) (finding an ongoing public controversy related to gifts and financial benefits given to college and high school athletes).

In support of her argument that she has not injected herself into any relevant controversy, plaintiff endeavors to unduly restrict this element in two respects. First, she advocates for the court to cabin the relevant controversy to (1) whether she had concerns that her husband was abusing boys in their home, and (2) that she had sex with Davis when he was in high school. *See* Dkt. No. 110-1 at 9 (arguing that "[d]efendants must show that there was a specific public controversy regarding Mrs. Fine, and the particularized accusations against her, prior to [ESPN's] November 27, 2011 reporting"). Plaintiff's reading of this *Lerman* factor, however, is unduly restrictive, as *Lerman* itself reflects. That case involved false accusations that the plaintiff, known publicly as Jackie Collins, appeared nude in the movie *The World is Full of Married Men*. *Lerman*, 745 F.2d at 127. In its decision, the Second Circuit identified the relevant public controversy as "the propriety of female or male nudity in films and in the print media generally." *Id.* at 138. In this instance, where the stories at issue published by defendants involved allegations that Bernie Fine sexually molested former ball boys for the Syracuse University men's basketball program, and

that plaintiff engaged in inappropriate sexual relations with one of the victims of Bernie Fine's abuse, the relevant controversies for purposes of this action are defined as the integrity of the Syracuse University men's basketball team and efforts to address at-risk youths. *See, e.g., Tavoulareas v. Piro*, 817 F.2d 762, 773-74 (D. D.C. 1987) (concluding that the public controversy was "[p]ublic policy toward the oil industry" in the context of a publication accusing an oil company executive of nepotism).

Plaintiff's further attempt to constrict the limited purpose public figure test relates to geography. In her brief, she asserts that, while she may be a limited purpose public figure locally, she has not gained national prominence or notoriety, and, because defendants' stories at issue were distributed nationwide, they are not protected by the actual malice standard. Dkt. No. 110-1 at 15-16. Plaintiff has failed to cite any cases, however, that support the overlay of geographical limitations upon the test articulated in *Lerman*. This issue was addressed in a footnote by the Fourth Circuit in its decision involving a case of an engineer-entrepreneur with connections to Arizona and South Carolina who sued the publisher of *Forbes* magazine, an internationally known publication. *Carr v. Forbes, Inc.*, 259 F.3d 273 (4th Cir. 2001). There, the court rejected a similar argument, observing the following:

> Of course, the Arizona and South Carolina media do
> not have the international readership of *Forbes*
> magazine. However, a court does not ask whether a
> defamation plaintiff has ever had access to a media
> outlet with the same size readership of the allegedly
> defamatory publication; such an inquiry would
> effectively prohibit widely read publications from
> ever commenting on local controversies. Our inquiry
> is rather whether the evidence demonstrates that
> the defamation plaintiff had access to channels of
> effective communication to respond to the allegedly
> defamatory statements. Carr clearly had such
> access.

*Carr*, 259 F.3d at 282 n.2; *see also Lluberes v. Uncommon Prods., LLC.*, 663 F.3d 6, 20-21 (1st Cir. 2011) (holding that the debate over geography has no relevance because "*Gertz* defined a *limited*-purpose public figure not in terms of geography but in terms of the controversy that he has stepped into." (emphasis in original)).

Plaintiff's argument in this regard also overlooks cases involving persons with far less fame and notoriety than plaintiff that have been declared limited public figures by the courts.[12] *See, e.g., Curry v. Roman*, 635 N.Y.S.2d 391, 395 (4th Dep't 1995) (finding an auctioneer a public

---

[12]     Persons who have been classified as limited purpose public figures have included published authors, performers at public events, athletic coaches, an association affiliated with schools that treat troubled teenagers, a leader of local drug and alcohol education efforts, a belly dancer, a former Playmate, a freelance journalist, a well-known book author, a lecturer, an author on nutrition, and the wife of a state senator who actively supported him politically and had a public role in his re-election campaign. *Sack on Defamation* § 5:3.5.

figure because he had "voluntarily thrust[ed] [himself] into the limelight in seeking media attention for the auction"); *Wilsey v. Saratoga Harness Racing, Inc.*, 140 A.D.2d 857, 858-59 (3d Dep't 1988) (finding that a harness-track horse-racing driver that "drove regularly" at the defendants' track located in Saratoga, New York, was "akin to a professional athlete or entertainer" based on, *inter alia*, (1) the plaintiff's admission that he "'developed and maintained an expertise in the field of harness driving and is so recognized by his profession and by the public in general'" and (2) "[h]arness racing attracts significant interest in the greater Capital District region and. . . throughout New York"); *James v. Gannett Co.*, 40 N.Y.2d 415, 423 (1976) (finding that the plaintiff, a belly dancer performing at single club in Rochester, New York, is a limited public figure under *Gertz* in light of her cooperation with the media for the purpose of attracting customers to the club).

Based upon the foregoing, I conclude that the record supports the conclusion that plaintiff has voluntarily injected herself in public controversies related to the subject of this litigation. The second of the *Lerman* factors has therefore been satisfied in this case.

### c. Plaintiff Assumed a Position of Prominence in the Public Controversies

The third relevant factor focuses on whether plaintiff has voluntarily assumed a sufficient degree of prominence in the controversies at issue. In this instance it is clear, including from her complaint, that, for many years, plaintiff embraced her public role as the spouse of an assistant men's basketball coach at a prominent university, and also as an advocate for at-risk youth, making herself publicly available to promote those causes. The extent to which plaintiff went to achieve that notoriety is reflected in her repeated appearances on television and radio broadcasts concerning the Syracuse University men's basketball team and organizations in the Syracuse community that support at-risk youth. Having affirmatively injected herself into the public spotlight in connection with these issues, plaintiff cannot now be heard to argue that this *Lerman* factor has not been satisfied. *Cf. Contemporary Mission, Inc.*, 842 F.2d at 618-19 (finding the plaintiffs' assertion that they have assumed a private life was "belied by the fact that they continued to thrust themselves into the public eye" through their conduct on behalf of a non-for-profit organization).

d.  <u>Plaintiff Has Maintained Regular and Continuing</u>
    <u>Access to the Media</u>

On this fourth and final *Lerman* factor, there can be little doubt. The record is replete with evidence of plaintiff's ability to access the media, including to defend against any alleged misstatements concerning herself. Plaintiff has appeared on radio and television shows on numerous occasions, has been regularly sought out by the media for comments and interviews, and has garnered a great deal of publicity over the years, including when this action was commenced in May 2012. *See, e.g.,* Dkt. No. 97-3 (plaintiff testifying that she "did a morning show on Wednesday's [sic] . . . just talking about the basketball team, just giving them an inside scope [sic]"); Dkt. No. 97-4 (DVD compiling plaintiff's appearances on *Bridge Street*); Dkt. No. 97-7 (DVD with recording of plaintiff's guest-reporting during March Madness). Indeed, the record reveals that plaintiff is someone who has "strived to achieve a measure of public acclaim," *James*, 40 N.Y.2d at 422-23, and, in fact, plaintiff maintains that the three publications by defendants at issue in this case interfered with her efforts at gaining further public notoriety and support.

In sum, I conclude that all of the four *Lerman* factors have been met in this case and therefore find, as a matter of law, that plaintiff is a limited purpose public figure in connection with this action.

C.    Merits of Plaintiff's Defamation Claims

1.    Defamation Standard Generally

Under New York law, defamation that is expressed in writing or print

constitutes a libel, a sub-species of defamation.[13] *Celle*, 209 F.3d at 176;

*accord, Church of Scientology Int'l v. Behar*, 238 F.3d 168, 173 (2d Cir.

2001); *see also Sack on Defamation* § 2:3. In order to recover for libel in

New York, a plaintiff must prove the following five elements:

> 1) a written defamatory statement of fact concerning
> plaintiff;
> 2) publication to a third party;
> 3) fault (either negligence or actual malice depending
> on the status of the libeled party);
> 4) falsity of the defamatory statement; and
> 5) special damages or per se actionability
> (defamatory on its face).

*Celle*, 209 F.3d at 176.

Defendants have conceded, for purposes of this motion, that the

statements in dispute (1) are defamatory, (2) are statements of fact

regarding plaintiff, and (3) have been published to third parties. Accordingly,

_____

[13]    In bringing this action, plaintiff has invoked diversity of citizenship, pursuant to 28 U.S.C. § 1332, as a basis for subject matter jurisdiction. Dkt. No. 1 at 3. Plaintiff alleges that she is a citizen of New York, while defendants Schwarz and Berko are citizens of Maryland, and ESPN is a citizen of both Delaware and Connecticut for purposes of diversity jurisdiction. *Id.* Ordinarily, the court would be required to engage in a choice-of-law analysis to determine whether New York law should govern. *Celle*, 209 F.3d at 175. In this case, however, the parties appear to be in agreement that New York law should apply. *See generally* Dkt. Nos. 98-1, 111-1.

the focus of this motion is whether the statements at issue were false, and whether a plaintiff can establish fault based upon the applicable standard. Defendants argue that no reasonable factfinder could conclude that either of the statements at issue was false, or that there is a basis to find fault under the governing standard. Plaintiff disagrees on both counts.

    2.   <u>Falsity</u>

There is an abundance of evidence in the record strongly suggesting that plaintiff engaged in sexual conduct with Davis, as reported by defendants. As an example, the following exchange occurred between plaintiff and Davis during their recorded conversation in October 2002:

| | |
|---|---|
| Laurie Fine: | No, I think – see, the money isn't the issue here. He lured you with the money. See, he knew full well what he was doing. |
| Bobby Davis: | Yeah, I know that. |
| Laurie Fine: | It had – it really had nothing to do with why you took what or what you did, who or – see, that's not even the issue. The issue at hand is that he had no business doing what he did with you. |
| Bobby Davis: | In retrospect – |
| Laurie Fine: | And you know what? Neither did I because I really helped screw you up a little more, too. |

Dkt. No. 45-12 at 22. Plaintiff, however, has flatly denied both that she had sex with Davis and the accusation that, during the recording, she admitted to having sex with Davis. *See, e.g.,* Dkt. No. 98-4 at 141-42; Dkt. No. 115-2 at 2. Accordingly, there exists a material dispute of fact that cannot properly be resolved by the court on motion for summary judgment concerning this issue.

Similarly, there is competing record evidence of plaintiff's awareness of her husband's abuse of minor boys. The telephone recording between Davis and plaintiff from October 2002 is replete with suggestions that plaintiff was aware of the abuse and did nothing to stop it. Dkt. No. 45-12. For example, at one point in their conversation the following exchange occurred between Davis and plaintiff:

| | |
|---|---|
| Laurie Fine: | [Bernie] always – thought that, that 'You, you used to make everybody so uncomfortable here [at the Fine's home].' |
| | I said: 'You know why? Because I knew what was going on, and it was uncomfortable for everybody involved.' |
| Bobby Davis: | Yeah. |
| Laurie Fine: | And the kids that came over were young kids, and you know, when you're young you really don't speak your mind. You just think that |

maybe it's right, what's going on. I
don't know the way kids think.

*Id.* at 8-9. In response to defendants' motion, however, plaintiff disputes not

only that she was aware of any child abuse by her husband, but she also

contends that the abuse never occurred in the first place. *See, e.g.,* Dkt. No.

111-1 at 15-22; Dkt. No. 111-4 at 48, 55, 203, 204.

Accordingly, the court is unable to determine the question of falsity at

this procedural juncture. Specifically, in light of the conflicting record

evidence regarding the truth as it relates to (1) whether plaintiff and Davis

had a sexual relationship and (2) whether plaintiff knew that her husband

was sexually molesting minors, I find that reasonable factfinders could

disagree as to the truthfulness of defendants' stories.

3.  Fault

The appropriate standard for assessing fault in a libel action is

dependent upon the status of the allegedly defamed party. Because plaintiff

has been found to be a limited purpose public figure, she must establish that

defendants published the three reports with actual malice. *Church of*

*Scientology Int'l*, 238 F.3d at 173-74; *Celle*, 209 F.3d at 182. "Actual malice

requires proof that the publisher had a subjective awareness of either falsity

or probable falsity of the defamatory statement, or acted with reckless

disregard of the [sic] truth or falsity." *Celle*, 209 F.3d at 182 (citing, *inter alia*, *Sullivan*, 376 U.S. at 280).

The actual malice test is subjective, measuring "whether there is sufficient evidence 'to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication[.]'" *Church of Scientology Int'l*, 238 F.3d at 174 (quoting *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968)). As the Supreme Court has noted, to establish actual malice, "[t]here must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard to truth or falsity and demonstrates actual malice." *St. Amant*, 390 U.S. at 731.

Because direct evidence of this element is rarely available, subjective reckless disregard for the truth may be inferred from objective facts. *Celle*, 209 F.3d at 183 (citing *Bose Corp. v. Consumer's Union of United States, Inc.*, 692 F.2d 189, 196 (1st Cir. 1982)). Potentially relevant objective factors informing the question of actual malice can include

> (1) whether a story is fabricated or is based wholly on an unverified, anonymous source, (2) whether the defendant's allegations are so inherently improbable that only a reckless person would have put them in circulation, or (3) whether there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports.

*Church of Scientology Int'l,* 238 F.3d at 174 (citing *St. Amant*, 390 U.S. 732).

In addition, the Supreme Court has offered the following guidance in

determining whether a plaintiff has established malice:

> The defendant in a defamation action brought by a public official cannot. . . automatically insure a favorable verdict by testifying that he published with a belief that the statements were true. The finder of fact must determine whether the publication was indeed made in good faith. Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call. Nor will they be likely to prevail when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation. Likewise, recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports.

*St. Amant*, 390 U.S. at 732 (footnote omitted).

To prevail on her defamation claim, it is plaintiff's burden to establish

actual malice by clear and convincing evidence. *Celle*, 209 F.3d at 183. This

heightened burden is properly considered by the court when evaluating

defendants' summary judgment motion, which should be granted if the court

concludes that no reasonable factfinder could find, by clear and convincing

evidence, that defendant published the three articles in question with actual

malice. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255-56 (1986)

("[W]here the factual dispute concerns actual malice, . . . the appropriate

summary judgment question [is] whether the evidence in the record could support a reasonable jury finding either that the plaintiff has shown actual malice by clear and convincing or that the plaintiff has not." (footnote omitted)).

Despite plaintiff's meek claim to the contrary, there is not one shred of evidence within the comprehensive record now before the court to suggest that defendants knew, at the time of publication, that their reports were false regarding whether (1) Bernie Fine was molested young boys, (2) plaintiff knew of her husband's conduct, or (3) plaintiff and Davis had a sexual relationship. Indeed, defendants have staunchly defended the truth of the publications from the time of publication to the date of filing of the motions now pending before the court. *See, e.g.,* Dkt. No. 98-27 at 4; Dkt. No. 38-28 at 11; 98-59 at 8.

Significantly, plaintiff has acknowledged that defendants believed the stories that they reported were true. *See* Dkt. No. 98-4 at 132 ("Oh, I believe the story they reported they thought was true. They thought was true. That's the operative word, thought was true. Absolutely."); *see also id.* at 196 ("Q. Mr. Siegel asked you whether you believed that the Defendants thought what they were publishing was true. I believe your answer to that question was yes. A. Yes."). Plaintiff clarified, in responses to interrogatories, that

she believed defendants "deluded themselves into believing in the truth of [their] statements" despite having "serious reason to doubt said statements." Dkt. No. 98-21 at 3. Her independent and unsupported belief in this regard is insufficient to counter the overwhelming record evidence demonstrating defendants' belief in the truth of their reports and raise an issue of fact in connection with the element of actual malice.

The pivotal question, then, is whether there is evidence from which a reasonable factfinder could conclude, by clear and convincing evidence, that defendants harbored serious doubts as to the truth of the statements contained in their publications. The record here contains no evidence from which a reasonable factfinder could conclude that the defendants had serious reservations or doubts concerning the accuracy of their reporting, or reasonably should have. The defendants' investigation began in 2003, with the recorded conversation from October 2002 between plaintiff and Davis strongly suggesting both that she was aware of her husband's abuse of young boys and that she had engaged in a sexual relationship with Davis to some degree. *See, e.g.,* Dkt. No. 98-27 at 2. Between the time that recorded conversation was provided to ESPN in 2003 and November 2011, when the stories were published, defendants Schwarz and Berko conducted a painstakingly thorough investigation, which included interviewing Davis

multiple times at length. *See, e.g., id.*; Dkt. No. 98-28 at 2, 16. In addition to interviewing Davis, defendants conducted interviews, both on camera and off, of Lang, Davis' step-brother, who credibly stated that he, like Davis, was molested by Bernie Fine when he was a minor and had a sexual relationship with plaintiff. Dkt. No. 98-28 at 13-14. The accounts of both Davis and Lang were corroborated by interviews of the Fines' babysitter and a neighbor, and buttressed by the preliminary findings of law enforcement agencies tasked with investigating the allegations against Bernie Fine. *Id.* at 7-8, 16-17.

In conducting their investigation that led up to the publication of the three stories at issue, defendants undertook the following steps:

(1)   Interviewed Davis multiple times and at length;

(2)   Interviewed Lang multiple times in 2003 and 2011, both by telephone and on camera;

(3)   Had senior editors, including Hays, Bray, and Doria, review the interviews and resulting stories;

(4)   Concluded that the accounts provided by Davis and Lang were similar concerning the abuse by Bernie Fine and the sexual contact with plaintiff;

(5)   Interviewed a neighbor of the Fines, Anthony Rinaldi, who stated that plaintiff accused her husband of abusing boys and solicited extramarital sex;

(6)   Interviewed Danielle Roache, the Fines' babysitter, and confirmed through her that plaintiff suspected her husband of abuse, including toward Davis, and that plaintiff freely sought extramarital affairs;

(7)     Solicited opinions from two national experts, in 2003, who confirmed that Bernie Fine's profile in Davis' account was typical of many abusers and their victims;

(8)     Independently conducted research regarding molestation of minors;

(9)     Consulted with Robert Shoop, another expert, in 2011, once Lang came forward, and confirmed that Lang's actions were consistent with abused persons and that false reports are rare; and

(10)    Monitored the progress of a law enforcement investigation into the allegations against Bernie Fine, concluding that the investigation supported the credibility of the allegations leveled against him.

The investigation conducted by defendants into the allegations spanned large periods of time, in both 2003 and 2011, before the stories in issue were published in November 2011. Before publication was approved, the stories were reviewed at several levels within ESPN. After the stories were published, ESPN conducted post-mortem reviews of the investigation and reporting, both internally and through an independent ombudsman, uncovering no deficiencies or reasons to question the veracity of the stories or the credibility of the sources relied upon.

Based upon the totality of the record now before the court, no reasonable factfinder could conclude, by clear and convincing evidence, that defendants published the three stories in question with awareness of

the falsity of their contents or reckless disregard for the truth. Accordingly, defendants are entitled to summary judgment dismissing plaintiff's complaint.[14]

III.   SUMMARY AND ORDER

Based upon the record now before the court I find, as a matter of law, that plaintiff was a limited purpose public figure at the time the three disputed stories were published by ESPN. While I discern the existence of a triable dispute of fact as to the falsity of the statements at issue, the record does not reveal any record evidence on which a reasonable factfinder could conclude that, when publishing those stories, defendants acted with actual malice. Accordingly, it is hereby

ORDERED that defendants' motion for a finding that plaintiff is a limited purpose public figure for purposes of this defamation action (Dkt. No. 97) is GRANTED; and it is further

ORDERED that defendants' motion for summary judgment (Dkt. No. 98) is GRANTED, and plaintiff's complaint is hereby DISMISSED in its entirety.

---

[14]    In light of this determination, I have not examined whether a reasonable factfinder could conclude that plaintiff can satisfy the gross irresponsibility standard under *Chapaddau*, 38 N.Y.2d at 199, which would apply if I had determined that plaintiff is a private figure. Similarly, I have found it unnecessary to examine whether all or some of plaintiff's claims are precluded under New York Civil Rights Law § 74.

Dated:      March 25, 2016
                Syracuse, New York

David E. Peebles
U.S. Magistrate Judge